OPINION OF THE COURT
Mary E. Bednar, J.
The respondent has brought a motion to dismiss the instant petition. The following are my findings of fact and conclusions of law.
The Facts
On April 25, 2007 the presentment agency filed a petition alleging that “on or about, a date in December 1999” the respondent committed acts which were he an adult would have constituted the crimes of criminal sexual act in the first degree (Penal Law § 130.50 [3]), sexual abuse in the first degree (Penal Law § 130.65 [3]), sexual misconduct (Penal Law § 130.20 [2]), and sexual abuse in the third degree (Penal Law § 130.55). At the time of the alleged acts, the respondent was nine years old and the complainant was five.
The respondent has filed a motion to dismiss the petition. He argues that the time between his alleged acts and the filing of the petition constitutes a violation of his right to a speedy fact-finding and that the time period specified for the alleged acts is impermissibly broad. The respondent also asks that I dismiss the petition in the furtherance of justice. The presentment agency filed answering papers in which it opposes dismissal.
On June 7, 2007 I held a hearing to determine whether the seven-year delay between the alleged acts and the filing of the instant petition violated the respondent’s due process rights. At the hearing the complainant, Carl R, and the complainant’s mother, Magdalia R, testified for the presentment agency. The respondent did not present any evidence. After the hearing, I reserved decision.
Carl R testified that the respondent is his stepbrother by his mother’s marriage to the respondent’s father. In December 1999, Carl, his mother and his stepfather lived in the same household. The respondent lived with his mother and would visit Carl’s family about three times a year. These visits coincided with major holidays.
In December 1999, during one of these visits, Carl and the respondent were in a bathtub when the respondent told Carl to put his penis in his mouth. Carl refused.
The respondent took a yellow plastic knife and, while placing it against Carl’s neck, threatened to kill him and his family if *793 he didn’t do as told. The plastic knife was from a toy science kit that Carl and the respondent received for Christmas, and was used to cut open plastic bugs.
Following the threat, Carl put the respondent’s penis in his mouth, for about 10 seconds. Carl then went to the opposite side of the tub, and with his back to the respondent, played with his toys. The respondent pushed Carl down and put his penis in his butt for about five seconds. Carl testified that it felt “like pooping but the other way.” (Transcript, June 7, 2007, at 20, line 6.)
After the assault the respondent climbed out of the tub and left the bathroom. Carl testified that the bathtub incident took place around noon time on a Saturday while his mother was cooking a large breakfast in the kitchen and his stepfather was sleeping.
The next day Carl told the respondent that he was going to tell on him. The respondent said that nobody would believe him. The respondent then purposefully spilled milk on a new sofa and said that he wouldn’t get punished for spilling the milk.
Carl’s mother cleaned up the milk and the respondent didn’t get punished, which made the respondent seem invincible. Carl testified that he was frightened by the threat the respondent made in the bathtub, and that he pushed the incident out of his mind.
In 2004 Carl’s mother and stepfather separated, and the respondent stopped visiting. In December 2004 Carl’s mother told him that she had been sexually abused by an uncle when she was a child.
This revelation prompted Carl to write in his diary that he had been raped by his stepbrother. Carl told the court that he had been keeping journals since age four, but had never before written about the incident in the bathtub.
Two or three weeks after he wrote the journal entry about being raped, Carl’s mother found the journal and asked him about the incident. Carl told his mother what happened. Carl’s mother asked him to tell the respondent’s father about the incident, but when Carl and his stepfather met to talk about the sex abuse, Carl denied that anything happened. Carl’s mother kept after Carl to tell the truth and eventually he did. Carl testified that his denials were attributable to his fear of the threat made by the respondent in the bathtub. He also testified that during *794 the period that he kept quiet about the abuse, he planned to tell people about it when he turned 13.
After telling his mother the truth about the sex abuse Carl began once-a-week sessions with the director of his school’s after-school program, and they talked about the abuse. The sessions took place every Friday for a year from 2005 to 2006, until the after-school director took a new job. When the after-school director left, Carl told a teacher about the sex abuse and the teacher sent Carl to a guidance counselor. The guidance counselor called the police.
On cross-examination Carl testified that he wrote his journal entry about the sex abuse soon after his mother and stepfather had separated. When asked why he didn’t tell anyone about the sex abuse after the respondent stopped visiting, Carl said that he was still frightened by the respondent’s threat. The following exchange then occurred between Carl and defense counsel:
“Q: But Anthony[*] wasn’t coming around anymore was he because his dad was gone, you were completely safe from him at that point; weren’t you?
“A: Yes.” (Transcript, June 7, 2007, at 37, lines 3-6.)
The last time that Carl saw the respondent was after the separation. It was a holiday and Carl and the respondent played video games together.
Magdalia R. testified that Carl is her son. She is married to the respondent’s father, and they have a six-year-old child together.
Ms. R. told the court that in December 2005 she found Carl’s journal lying face down and open on a reading table while she was cleaning. She read the page the journal was open to which said that Carl had been “raped by Anthony.” (Transcript, June 7, 2007, at 47, line 21.)
When Ms. R. asked Carl about the journal entry he expressed anger that his mother had read his journal. Then he said that he had been touched by the respondent.
Ms. R. told the respondent’s father what Carl had said, and dropped Carl off at his workplace so that Carl could tell him what happened. But the respondent’s father told Ms. R. that Carl denied that anything happened with the respondent. Ms. R. then sat down with Carl and the respondent’s father, and Carl again denied that anything happened.
*795 Ms. R. searched Carl’s room for other diaries he may have written, and came across a journal entry in which Carl said he should have told the truth about being abused by the respondent. Ms. R. showed this journal entry to Carl, who said that the story about the sex abuse was true.
After this latest revelation, Ms. R. enrolled Carl in an after-school therapy program, which he attended between December 2005 and November 2006. It was sometime during this period that Ms. R. learned the full extent of the alleged abuse. Before this she believed that only touching had been involved.
On November 19, 2006 Ms. R. received a call from Carl’s guidance counselor who said that Carl had told him about the sex abuse, and that she should come to the school. The guidance counselor called the police about what Carl had told her.
Ms. R. also testified that she didn’t report the alleged abuse to the police, because she assumed that the respondent must have been sexually abused himself as a child and that she wanted to resolve the situation through therapy and mediation. She also said that she and the respondent’s father had agreed that Carl and the respondent would never be alone together. She approached the respondent’s father about getting professional help for the family. The respondent’s father said that the respondent’s mother wanted to arrange a meeting between herself, the respondent, the respondent’s father, and Ms. R. Ms. R. refused to attend such a meeting as it would be “three against one.” She also said that she had trouble finding a therapist for Carl once the after-school therapy ended.
On cross-examination Ms. R. testified that Carl has kept journals ever since he learned to write, and before December 2005 she had never read any of his diary entries. When she found the journal on her reading table she became angry at Carl for leaving the journal out when he knew she was cleaning. She was going to yell at him “when I turned it over and saw it on the side.” (Transcript, June 7, 2007, at 58, line 16.)
In contrast to Carl’s account about how he learned that his mother had been sexually abused as a child, Ms. R. told the court that a few weeks before the journal was discovered Carl overheard Ms. R. and Ms. R.’s mother arguing about sex abuse that Ms. R. suffered as a child. Carl referenced this argument in his diary, writing “whoa, mom and me are so alike because I was also abused, I was raped.” (Transcript, June 7, 2007, at 63, lines 15-17.)
*796 Ms. R. and the respondent’s father have been separated for three years, and the respondent’s father told Ms. R. that he has initiated divorce proceedings. The couple have a custody case in Manhattan Family Court involving their six-year-old child.
Ms. R. told the court that 1999 was the first Christmas that the respondent spent at her apartment. Ms. R. has possession of the journal that contained Carl’s entry about being raped, and she scanned the entry from the second diary in a computer.
In an oral summation following the hearing, the respondent’s Law Guardian argued that the complainant’s testimony was not credible in regard to the reason for his delay in revealing the alleged sex abuse. The presentment agency rested on the testimony.
I found Ms. R.’s testimony to be entirely credible. Although the cross-examination of the complainant brought out contradictions in his testimony, I found him credible in regard to when and how he revealed his allegations of being sexually abused.
Conclusions of Law
In Matter of Benjamin L. (92 NY2d 660 [1999]), the Court of Appeals extended the due process right to a speedy trial that had been announced in People v Taranovich (37 NY2d 442 [1975]) to juvenile delinquency proceedings. In Taranovich, the Judges cited five factors when evaluating preindictment delays: (1) the extent of the delay, (2) the reason for the delay, (3) the nature of the underlying charge, (4) whether there has been an extended period of pretrial incarceration, and (5) whether there is any indication that the defense has been prejudiced or impaired by the delay. (People v Taranovich at 445.) The Benjamin L. court applied these factors to a 13-month delay between a prepetition detention application and the filing of a juvenile delinquency petition with the proviso that “In applying this test. . . courts must remain acutely cognizant of the goals, character and unique nature of juvenile proceedings.” (Benjamin L. at 668.) To this end, the Judges noted that “A juvenile is less likely than an adult to preserve his or her memory concerning the incident in question, his or her whereabouts on relevant dates, the identity of potential witnesses, and various other crucial details.” (Benjamin L. at 669.)
Unlike Benjamin L., there was no prosecutorial involvement in the instant proceeding prior to the filing of the delinquency petition. “Nevertheless, the nature and purpose of juvenile proceedings necessitates a close look at the reasons for the delay *797 and whether respondent is unduly prejudiced by it.” (Matter of Bryan K., NYLJ, Sept. 8, 2000, at 32, col 6 [Fam Ct, Suffolk County].)
In the case at bar, the delay between the acts and the filing of the delinquency petition is entirely reasonable given that Ms. R. first became aware of the alleged sex abuse six years after Carl claims it occurred. Ms. R.’s plan for mediation and therapy after learning of the sex abuse was also understandable, especially given the family dynamics involved and the decision by Ms. R. and the respondent’s father never to allow Carl and the respondent to be alone together. Overall, Ms. R. acted in good faith regarding Carl’s allegations and the presentment agency acted promptly once it was informed of the allegations. (See, Matter of Christine B., 5 Misc 3d 1026[A], 2004 NY Slip Op 51570[U] [Fam Ct, Queens County 2004] [speedy trial dismissal motion denied in part because complainant’s mother tried to resolve dispute between respondent and complainant prior to bringing the issue to the police].)
Turning to the issue of prejudice, “[a] defendant claiming a due process violation resulting from a pre-indictment delay must demonstrate actual prejudice where the delay between the crime and defendant’s arrest was justifiable.” (Matter of J.M., NYLJ, Oct. 3, 2000, at 31, col 2 [Fam Ct, Westchester County], citing People v Jones, 267 AD2d 250 [2d Dept 1999].) The respondent in the case at bar failed to satisfy this burden as he made no showing of specific prejudice. (See, People v Fuller, 57 NY2d 152, 160 [1982] [finding defendant’s “routine-like claim of prejudice” insufficient to support a due process violation allegation].) Moreover, Carl’s account of the alleged sexual assault is detailed as to time, place and the sequence of events.
And while I am mindful of the concern expressed in Benjamin L. regarding the difficulty juveniles have in remembering long-ago events, finding prejudice based solely on the length of delay would be at odds with the Judges’ declaration that “we do not endorse a per se rule regarding speedy trial violations.” (Matter of Benjamin L. at 670.)
A review of the remaining Taranovich factors also weighs against dismissal. The respondent was never incarcerated and there has been no showing that rehabilitation services for the respondent are unnecessary (see, Matter of J.M., supra, NYLJ, Oct. 3, 2000 at 31, col 2 [Fam Ct, Westchester County] [court unconvinced that rehabilitation efforts in sex abuse case are unnecessary even though respondent claimed that he participated *798 in counseling and that his parents and the complainant’s parents had resolved the matter]).
Also working against dismissal is the Legislature’s determination not to place a statute of limitations on the crimes of criminal sexual act in the first degree and sexual abuse in the first degree (see, CPL 30.10 [2] [a]), as well as its decision to suspend the two-year statute of limitations for misdemeanor sex offenses until “the child has reached the age of eighteen or the offense is reported to a law enforcement agency or statewide central register of child abuse and maltreatment, whichever occurs earlier.” (CPL 30.10 [3] [f]; see, People v Vernace, 274 AD2d 595, 595 [2d Dept 2000] [holding that “(i)mplicit in the determination not to place a Statute of Limitations on homicide is that a defendant’s claim that he or she was denied the right to a speedy trial will be closely scrutinized”].)
I find that the presentment agency sufficiently explained the gap between the allegations and the filing of the instant petition, that the presentment agency and the complainant’s mother acted in good faith once the allegations became known and that the respondent failed to show that he was unduly prejudiced by the delay, or that rehabilitative efforts would be unnecessary should there be a finding of juvenile delinquency. For all the reasons herein, the respondent’s motion to dismiss based upon speedy trial grounds is denied (see, People v Wing Keung Tsang, 284 AD2d 218 [1st Dept 2001] [20-year delay in commencing murder prosecution is reasonable where delay was caused by defendant’s efforts to avoid arrest, defendant was not incarcerated and there was no showing of specific prejudice]; People v Jones, 267 AD2d 250 [2d Dept 1999] [seven-year delay between murder and arrest did not violate defendant’s due process rights]; People v Vernace, supra [17-year delay between murder and indictment did not violate defendant’s due process rights]; Matter of J.M., supra [one-year delay in prosecution of juvenile delinquency sex abuse case does not violate due process where respondent was not incarcerated, there is no showing of prejudice to respondent even though the presentment agency could not give a date certain of the alleged incident and the reason for the delay is largely attributed to inability of prosecutor to get statement from complainant, despite a good faith effort to do so]).
I also find that the petition was sufficiently specific regarding the time and date of the alleged offense, especially since the complainant specified that the alleged acts occurred at noon *799 time on a Saturday near Christmas 1999 (see, People v Morris, 61 NY2d 290, 292 [1984] [indictment saying that rape and sodomy of six-year-old victim took place “during the month of November 1980” is sufficiently specific to withstand dismissal motion]; People v Duell, 266 AD2d 649 [3d Dept 1999] [defendant’s need for greater specificity of indictment’s charges can be remedied through discovery]).
I will hold the motion for dismissal in the furtherance of justice in abeyance as it can be granted “at any time.” (See, Family Ct Act § 315.2 [1].)

* Carl called the respondent Anthony.